William H. Brownstein, SBN 84507
William H. Brownstein & Associates,
Professional Corporation
11755 Wilshire Boulevard
Suite 1250
Los Angeles, CA 90401-1540
(310) 458-0048
FAX: (310) 362-3212
Email: Brownsteinlaw.bill@gmail.com

Attorneys for Tomer Fridman, Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No. 1:16-bk-11729MB |
| TOMER FRIDMAN, | Chapter 11 |
| | DECLARATION OF WILLIAM H. BROWNSTEIN REGARDING MOTION FOR VALUATION OF REAL PROPERTY LOCATED AT 3915 PRADO DEL MAIZ, CALABASAS AND EXHIBIT |
| | DATE: March 28, 2017<br>TIME: 1:30 p.m.<br>COURTROOM: 303<br>LOCATION: 21041 Burbank Boulevard<br>Third<br>Woodland Hills CA 91367 |
| Debtor and<br>Debtor in Possession. | |

TO THE HONORABLE MARTIN BARASH BANKRUPTCY JUDGE, ALL SECURED CREDITORS, THE UNITED STATES TRUSTEE FOR THE CENTRAL DISTRICT OF CALIFORNIA AND THE OTHER PARTIES IN INTEREST:

Incorporated herein is the Declaration of William H. Brownstein Regarding Motion for Valuation of Real Property Located at 3915 Prado Del Maiz, Calabasas, the continued hearing on which is scheduled to take place on March 28, 2017 at 1:30 p.m., or as soon thereafter as the Honorable Martin Barash Bankruptcy Judge, will hear the matter in his courtroom which is located at 21041 Burbank Boulevard, Courtroom 303, Third Floor, Woodland Hills, California 91367.

1

DATED: March 27, 2017                    Respectfully submitted,

2                                                      William H. Brownstein & Associates,
                                                          Professional Corporation

3

4        By: _____

5                                                      William H. Brownstein, Attorneys for
                                                      Debtor and Debtor in Possession

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF WILLIAM H. BROWNSTEIN REGARDING MOTION FOR VALUATION OF REAL
PROPERTY LOCATED AT 3915 PRADO DEL MAIZ, CALABASAS AND EXHIBIT

## DECLARATION OF WILLIAM H. BROWNSTEIN

I, William H. Brownstein, do hereby declare and state as follows:

1.      I am an attorney at law duly admitted to practice before all courts of the State of California and before this Court.

2.      I am a Certified Specialist in Bankruptcy Law by the State Bar of California and I am the president and shareholder of William H. Brownstein & Associates, Professional Corporation, on whose behalf, on January 3, 2017, I caused the application to be employed as counsel to be filed and served on all creditors and other parties in interest and I am waiting for the passage of the 17 days that they have to object or request a hearing before filing my declaration and order on the employment application.

3.      I make the following declaration based on my own knowledge, information and belief.

4.      Pursuant to the Order of the Honorable Martin R. Barash, Bankruptcy Judge, entered December 20, 2016, the Chapter 13 case initially filed by the Debtor in pro per was converted to a case under Chapter 11 of the Bankruptcy Code.

5.      At the prior hearing on the valuation motion the issue of what the amount of the claim of JPMorgan Chase Bank ("Chase"), the holder of the note secured by a first deed of trust was raised. As of that time, Chase had not filed a Proof of Claim and I therefore requested that the Court continue the hearing in order to enable me to find out the amount of its claims. Incorporated herein by this reference as Exhibit "A" is a true and correct copy of the Chase POC which shows a claim of $2,103,964.03.

6.      The appraisal that the Debtor included with the LAM motion shows a value of $2,010,000.

7.      Trojan Capital Investments LLC ("Trojan") filed its Motion for Relief from Stay, Doc. No 64, in which it shows a value of $1,950,000 for a quick sale and a value of $2,250,000 for a sale in 90-120 days in current condition. Document 64 page 33 of 36. That valuation was made without a formal appraisal and Debtor objected to the valuations made by Trojan.

---

DECLARATION OF WILLIAM H. BROWNSTEIN REGARDING MOTION FOR VALUATION OF REAL PROPERTY LOCATED AT 3915 PRADO DEL MAIZ, CALABASAS AND EXHIBIT

8.    In my Email to Henry Polosi III, Esq., Trojan's counsel, I noted that even taking the valuations shown in the RFS Motion, the claim of Trojan would be totally undersecured. More specifically, if we take the high end of you valuation and deduct the 8% cost of sale the net to the estate would be $2,070,000.00. That would still leave your client as a totally unsecured creditor and if we the market value as of the RFS Motion, which, according to the value in your RFS Motion, it would be $1,950,000 less 8% for $1,794,000.00, also rendering your client totally unsecured.

9.     I also gave Mr. Palosi the names of the following appraisers:

a.    David Gribin, 8182250097. 22551 Ventura Blvd #201, Woodland Hills, CA 91364, United States

b.    Linda M. Bascom, who did the appraisal in the Forrest case. Very objective and honest.

c.    Cliff Bourland, 3105673002.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief under the laws of the United States of America and if called upon to testify thereon as a witness I would be competent to so testify.

Executed this 27th day of March 2017 in Los Angeles, California.


_____
William H. Brownstein

DECLARATION OF WILLIAM H. BROWNSTEIN REGARDING MOTION FOR VALUATION OF REAL PROPERTY LOCATED AT 3915 PRADO DEL MAIZ, CALABASAS AND EXHIBIT

4

Fill in this information to identify the case

| | |
|---|---|
| Debtor 1 : | Tomer Fridman |
| Debtor 2 : | N/A |
| (Spouse, if filing) | |
| United States Bankruptcy Court for the | Central    District of:    California |
| Case number: | 1:16-bk-11729-MB |

Official Form 410

## Proof of Claim

4/16

Read the instructions before filling out this form. Use this form to make a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:    Identify the Claim

| | | |
|---|---|---|
| 1. | Who is the current creditor? | JPMorgan Chase Bank, National Association |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |
| 2. | Has this claim been acquired from someone else? | [X] No. |
| | | [ ] Yes.    From Whom? |
| 3. | Where should notices and payments to the Creditor be sent?    Federal Rule of Bankruptcy Procedure | Where should notices to the creditor be sent?    Where should payments to the creditor be sent? (if different) |
| | | Chase Records Center    JPMorgan Chase Bank, N.A. |
| | | Name    Name |
| | | Attn: Correspondence Mail |
| | | Mail Code LA4-5555    Mail Code: OH4-7142 |
| | | 700 Kansas Lane    3415 Vision Drive |
| | | Number    Street    Number    Street |
| | | Monroe    LA    71203    Columbus    OH    43219 |
| | | City    State    Zip Code    City    State    Zip Code |
| | | Contact phone  1-866-243-5851    Contact phone  1-866-243-5851 |
| | | Contact email    Contact email |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): |
| 4. | Does this claim amend one already filed? | [X] No. |
| | | [ ] Yes.    Claim number on court claims registry (if known)    Filed On ___ / ___ / ___ |
| | | mm / dd / yy |
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | [X] No. |
| | | [ ] Yes.    Who made the earlier filing? |

Official Form 410    Proof of Claim    page 1

| Debtor: | Name | Tomer Fridman | | Case Number (if known) | 1:16-bk-11729-MB |
|---|---|---|---|---|---|

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| 6. | Do you have any number you use to identify the debtor | ☐ No. | | |
|---|---|---|---|---|
| | | ☒ Yes. | Last 4 digits of the debtor's account or any number you use to identify the debtor | 8636 |

---

7.    How much is the claim?    $ 2,103,964.04

Does this amount include interest or other charges?

☐ No.

☒ Yes. Attach statement itemizing interest, fees, expenses, or other Charges required by Bankruptcy Rule 3001(C)(2)(A)

---

8.    What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.
Attach any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as healthcare information.

Money Loaned

---

9.    Is all or part of the claim secured?

☐ No.

☒ Yes.    The claim is secured by a lien on property.
Nature of property:

☒ Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle

☐ Other. Describe:

Basis for perfection:    Recorded Security Instrument
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of Property:    $ _____

Amount of the claim that is secured:    $ 2,103,964.04

Amount of the claim that is unsecured:    $ _____    (The sum of secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $ 82,019.92

Amount Interest Rate (When case was filed)    4.00000%
☐ Fixed
☒ Variable

---

10.    Is this claim based on a lease?

☒ No.

☐ Yes. Amount necessary to cure any default as of the date of the petition.    $ _____

---

11.    Is this claim subject to a right of setoff?

☒ No.

☐ Yes. Identify the property: _____

---

Official Form 410    Proof of Claim    page 2

EXHIBIT "1"
6

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | | |
|---|---|---|
| | [X] **No** | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | [ ] **Yes.** *Check all that apply* | **Amount entitled to priority** |
| | [ ] Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B) | $ _____ |
| | [ ] Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | [ ] Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | $ _____ |
| | [ ] Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | [ ] Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | [ ] Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

**Part 3:  Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

[ ] I am the creditor

[X] I am the creditor's attorney or authorized agent.

[ ] I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

[ ] I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    03/24/2017
                    MM / DD / YYYY

/s/  Nathan F. Smith_____
    Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Nathan | F | Smith |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Attorney for JPMorgan Chase Bank, National Association |
|---|---|

| Company | MALCOLM ♦ CISNEROS, A Law Corporation |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 2112 Business Center Drive |
|---|---|
| | Number          Street |
| | Irvine          California     92612 |
| | City          State     Zip Code |

| Contact Phone | (949) 252-9400 | Email | nathan@mclaw.org |
|---|---|---|---|

EXHIBIT "1"

7

## Mortgage Proof of Claim Attachment

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.

**Part 1: Mortgage and Claim Information**

Case number: 1:16-bk-11729-MB
Debtor 1: Tomer Fridman
Debtor 2:
Last 4 digits to identify: 8626
Creditor: JPMorgan Chase Bank, National Association
Servicer: JPMorgan Chase Bank, N.A.
Fixed accrual/daily
simple interest/other: Variable

Case Number: 1:16-bk-11729-MB
Debtor 1: Tomer Fridman

**Part 2: Total Debt Calculation**

| | |
|---|---|
| Principal Balance: | $1,624,188.80 |
| Deferred Balance: | $419,000.00 |
| Interest due: | $39,991.14 |
| Fees, costs due: | $0.00 |
| Escrow deficiency for funds advanced: | $20,776.10 |
| Less total funds on hand: | $0.00 |
| Total debt: | $2,103,964.04 |

**Part 3: Arrearage as of Date of the Petition**

| | |
|---|---|
| Principal & interest due: | $54,902.40 |
| Prepetition fees due: | $0.00 |
| Escrow deficiency for funds advanced: | $20,776.10 |
| Projected escrow shortage: | $6,341.42 |
| Less funds on hand: | $0.00 |
| Amount Waived Post-petition | |
| Amount per Court Order | |
| Total prepetition arrearage: | $82,019.92 |

**Part 4: Monthly Mortgage Payment**

| | |
|---|---|
| Principal & Interest: | $7,332.62 |
| Monthly escrow: | $2,759.22 |
| Private mortgage insurance: | $0.00 |
| Total monthly payment: | $10,091.84 |

**Part 5: Loan Payment History from First Date of Default**

| A. Date | B. Contractual Payment Amount | C. Funds Received | D. Amount Incurred | E. Description | F. Contractual Due Date | G. Prin, int & esc past due balance | H. Amount to principal | I. Amount to interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/07/2016 | $9,006.49 | | | PAYMENT DUE | | $0.00 | | | | | | $1,628,906.82 | | $7,046.77 | $0.00 | $0.00 |
| 03/10/2016 | | | | COUNTY TAX | | $9,006.49 | | | | | | $1,628,906.82 | | $7,046.77 | $0.00 | $0.00 |
| 03/16/2016 | | | $319.03 | LATE CHARGE ASSESSED | | $9,006.49 | | | | | | $1,628,906.82 | | $7,046.73 | $0.00 | $0.00 |
| 03/21/2016 | | $9,100.00 | | PAYMENT APPLIED | 03/01/2016 | $0.00 | $2,320.72 | $4,297.26 | $2,615.51 | $141.51 | | $1,626,586.20 | | $4,661.22 | $178.14 | $0.00 |
| 04/05/2016 | $9,006.49 | | | PAYMENT DUE | | $9,006.49 | | | | | | $1,626,586.20 | | $4,661.22 | $178.14 | $0.00 |
| 04/16/2016 | | | $319.80 | LATE CHARGE - ASSESSED | | $9,006.49 | | | | | | $1,626,980.20 | | $4,661.22 | $497.79 | $0.00 |
| 04/18/2016 | | $9,076.16 | | PAYMENT APPLIED | 04/01/2016 | $0.00 | $2,320.52 | $4,049.46 | $2,615.61 | | $902.67 | $1,624,259.66 | | $2,205.71 | $497.79 | $497.79 |
| 04/30/2016 | | | | PRINCIPAL PAYMENT | | $0.00 | $989.88 | | | | $89.80 | $1,624,189.80 | | $2,205.71 | $497.79 | $497.79 |
| 05/07/2016 | $6,393.00 | | | PAYMENT DUE | | $6,393.00 | | | | | | $1,624,189.80 | | $2,205.71 | $497.79 | $497.79 |
| 06/09/2016 | | | | LATE CHARGE PAID | | $6,393.00 | | | | $497.79 | $407.79 | $1,624,189.80 | | $2,205.71 | $0.00 | $0.00 |
| 06/01/2016 | $6,393.00 | | | PAYMENT DUE | | $12,786.00 | | | | | | $1,624,189.80 | | $2,205.71 | $0.00 | $0.00 |
| 07/05/2016 | $6,393.00 | | | PAYMENT DUE | | $19,179.00 | | | | | | $1,624,189.80 | | $2,205.71 | $0.00 | $0.00 |
| 08/05/2016 | $6,393.00 | | | PAYMENT DUE | | $25,572.00 | | | | | | $1,624,189.80 | | $2,205.71 | $0.00 | $0.00 |
| 09/01/2016 | $7,332.64 | | | PAYMENT DUE | | $32,904.64 | | | | | | $1,624,189.80 | | $2,205.71 | $0.00 | $0.00 |
| 10/01/2016 | $7,332.64 | | | PAYMENT DUE | | $40,237.28 | | | | | | $1,624,189.80 | | $2,205.71 | $0.00 | $0.00 |
| 11/01/2016 | $7,332.64 | | | PAYMENT DUE | | $47,569.92 | | | | | | $1,624,189.80 | | $2,205.71 | $0.00 | $0.00 |
| 11/14/2016 | | | | COUNTY TAX | | $47,569.92 | | | | $14,819.24 | | $1,638,984.05 | | $2,205.71 | $0.00 | $0.00 |
| 11/28/2016 | | | | HOMEOWNERS INSURANCE | | $47,569.92 | | | $2,801.75 | | | $1,638,984.05 | | $2,205.71 | $0.00 | $0.00 |
| 12/01/2016 | $7,332.64 | | | PAYMENT DUE | | $54,902.56 | | | | | | $1,624,189.80 | | $20,776.10 | $0.00 | $0.00 |
| 12/20/2016 | | | | BK FILED DATE | | $54,902.56 | | | | | | $1,624,189.80 | | $20,776.10 | $0.00 | $0.00 |

EXHIBIT "1"

8

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

| BK Case #: | 1:16-bk-11729-MB | **Proof Of Claim Attachment** | Loan #: | 8636 |
|---|---|---|---|---|

Basis for asserting that the applicable party has the right to foreclose

JPMorgan Chase Bank, N.A., services the loan on the property referenced in this proof of claim.  In the event the automatic stay in this case is lifted/set aside, this case dismisses, and/or the debtor obtains a discharge and a foreclosure action is commenced on the mortgaged property, the foreclosure will be conducted in the name of JPMorgan Chase Bank, National Association

Said entity, directly or through an agent, has possession of the promissory note.  The promissory note is either made payable to said entity or has been duly endorsed.

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Servicer Loan #: 8636
Borrower Name: Tomer Fridman
BK Case Number: 1:16-bk-117729-MB

Interest Rate: 4.000%
1st Principal Balance: $1,624,188.80
Escrow Balance: $(20,776.10)
Suspense Balance: $(0.00)

| Transaction Description | Transaction Code | Transaction Date | Ins Premium Disb Due Date | Escrow Amount | Escrow Disbursement | Escrow Balance |
|---|---|---|---|---|---|---|
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,637.40 | | $(16,471.71) |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,637.40 | | $(13,834.31) |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,615.51 | | $(11,218.80) |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,615.51 | | $(8,603.29) |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,615.51 | | $(5,987.78) |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,615.51 | | $(3,372.27) |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,615.51 | | $(756.76) |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,615.51 | | $1,858. |
| Payment Application | 173 | 01/14/2016 | 01/13/2016 | $2,615.51 | | $4,474. |
| Payment Application | 173 | 02/13/2016 | 02/12/2016 | $2,615.51 | | $7,089. |
| Disb. for COUNTY TAX | 312 | 03/10/2016 | 03/10/2016 | | $(14,586.50) | $(7,496.7 |
| Payment Application | 172 | 03/31/2016 | 03/30/2016 | $2,615.51 | | $(4,881. |
| Payment Application | 172 | 05/02/2016 | 04/30/2016 | $2,615.51 | | $(2,265. |
| Disb. for COUNTY TAX | 312 | 11/14/2016 | 11/14/2016 | | $(14,619.24) | $(16,884.9 |
| Disb. for HOMEOWNERS INSURANCE | 351 | 11/29/2016 | 11/29/2016 | | $(3,891.15) | $(20,776. |
| | | | | | | $(20,776.1 |
| | | | | | | $(20,776.1 |
| | | | | | | $(20,776.1 |
| | | | | | | $(20,776.1 |

EXHIBIT "1"
10

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

**Loan #**   8636   **Case #**   1:16-bk-11729-MB
## Disclosure

Part 3 of form B410A requires Chase to calculate the prepetition escrow deficiency for funds advanced and the projected escrow shortage separately from the principal and interest (P&I) portion of all monthly installments that remain unpaid as of the petition date. In order to make this calculation, Chase adjusts its system to reduce the escrow portion of the monthly installment payment to $0.01 for each escrow advance type. For example, where the unpaid monthly installment payments were $1,200 ($800 P&I, $300 taxes, $100 insurance) prior to bankruptcy, the unpaid monthly installment payments will be reduced to $800.02 ($800 P&I, $0.01 taxes, $0.01 insurance). Please note that to the extent that Private Mortgage Insurance ("PMI") is contained within the monthly installment payment, it is not reduced to a penny in this process.

Because the adjustment process occurs before part 5 of form B410A is completed, any unpaid monthly installment payments listed in column B (and the past due balance in Column G) will be listed at the reduced amount rather than the contractual payment amount listed in monthly statements received prior to bankruptcy.

Monthly installment payments listed on part 5 that were paid prior to the petition date include the full pre-petition escrow payment because those payments were made and applied prior to the reduction of the escrow payment. In the example provided, paid monthly installments in part 5 would be listed at $1,200. Unpaid monthly installments listed in part 5 would be listed at $800.02. The debtor's post-petition escrow payment is also not impacted by this process and is set forth in Part 4 of form B410A.

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

 

## ADJUSTABLE RATE NOTE
### (12-MTA Index - Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN _____115%_____ OF THE ORIGINAL AMOUNT (OR $_____2,254,000.00_____). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

_____JULY 11, 2007_____    _____ENCINO_____, _____CALIFORNIA_____
                                        CITY                              STATE


_____25420 PRADO DE LAS PERAS, CALABASAS, CA  91302_____
                        PROPERTY ADDRESS

### 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ _____1,960,000.00_____ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is _____WASHINGTON MUTUAL BANK, FA_____. I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

### 2. INTEREST
Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of _____7.706_____%. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of _____1.200_____%. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS
(A) Time and Place of Payments
I will pay Principal and Interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.
I will make my monthly payments on _____1ST_____ day of each month beginning on _____SEPTEMBER, 2007_____, I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on _____AUGUST 01, 2037_____, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at _____P.O. BOX 78148 PHOENIX, AZ 85062-8148_____
_____, or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ _____6,485.81_____, unless adjusted at an earlier time under Section 4(H) of this Note.

Page 1 of 6                              LNT60USA (VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the ___1ST___ day of ___SEPTEMBER, 2007_____, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each Interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___TWO AND 70/100_____ percentage points ___2.700___% ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___TEN AND 25/100_____ percentage points ___10.250___% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___SEPTEMBER 01, 2008_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

Page 2 of 6                                    LNT60USB (VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to __115%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __115%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

LNT60USC (VERSION 1.0)

EXHIBIT "1"

14

Reviewer ID: Fabunmi_Fadairo_2017-03-23_14:45:04

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ _15.00_ . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _FIFTEEN_ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5.000_ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Page 4 of 6                                    LNT60USD (VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017_03_23_12:45:04

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

Page 5 of 6                                 LNT60USE (VERSION 1.0)

EXHIBIT "1"

16

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

TOMER FRIDMAN

Pay to the order of

Without Recourse
WASHINGTON MUTUAL BANK, FA

By

CYNTHIA RILEY
VICE PRESIDENT

Page 6 of 6

LNT60USF (VERSION 1.0)

EXHIBIT "1"

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



[RECORDING REQUESTED BY]
NATIONWIDE TITLE CLEARING
[AND WHEN RECORDED MAIL TO]
JPMorgan Chase Bank, NA
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

Loan #



## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA, WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, MONROE, LA, 71203, (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Deed of Trust without recourse, representation or warranty, together with all right, title and interest secured due thereon, all liens, and any rights due or to become due thereon to JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Said Deed of Trust made by TOMER FRIDMAN and recorded on 07/18/2007 as Instrument # 20071696484 in Book n/a, Page n/a in the office of the LOS ANGELES County Recorder, California.

Property more commonly known as: 25420 PRADO DE LAS PERAS, CALABASAS, CA 91302

This Assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver.

This Assignment is intended to further memorialize the transfer that occured by operation of law on September 25, 2008 as authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. S1821 (d)(2)(G)(i)(II)

IN WITNESS WHEREOF, this Assignment is executed on _02 / 14 /_2013 (MM/DD/YYYY)
FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA, by JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, its Attorney-in-Fact   POA RECORDED: 11/07/2012 DOC#: 20121694975

By: _Audra Gardenhi_
_Audra Gardenhi_
VICE PRESIDENT

## ACKNOWLEDGEMENT

STATE OF LOUISIANA
PARISH OF OUACHITA
On _02 / 14_ 2013 (MM/DD/YYYY), before me appeared _Audra Gardenhi_ , to me personally known, who did say that he/she/they is/are the VICE PRESIDENT of JPMORGAN CHASE BANK, NATIONAL ASSOCIATION as Attorney-in-Fact for FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_Y.K. Wilson_
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
JPCAS          -1 WAMU          T1213022316 [C] FRMCA1

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



This page is part of your document - DO NOT DISCARD



# 20130286095

**Pages:**
**0002**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

## 02/25/13 AT 04:46PM

| | |
|---|---|
| FEES: | 18.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 18.00 |



**LEADSHEET**



**SEQ:**
**01**

ERDS - Daily



**THIS FORM IS NOT TO BE DUPLICATED**

E13

E185156

EXHIBIT "1"

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



This page is part of your document - DO NOT DISCARD

**20071696484** Pages: 026

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

07/18/07 AT 08:00AM

Fee: 160.00
Tax: 0.00
Other: 0.00
Total: 160.00

Title Company

**TITLE(S) :**

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.

Number of AIN's Shown

**THIS FORM IS NOT TO BE DUPLICATED**

EXHIBIT "1"

20

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

2

RECORDED AT THE REQUEST OF
CHICAGO TITLE COMPANY

Recording Requested By:
WASHINGTON MUTUAL BANK  FA

Return To:
WASHINGTON MUTUAL BANK  FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

07/18/07

**20071696484** 

Prepared By:
SUSAN CROCFER

——— [Space Above This Line For Recording Data] ———

# DEED OF TRUST

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  JULY 11, 2007
together with all Riders to this document.
(B) "Borrower" is  TOMER FRIDMAN ,A SINGLE MAN

Borrower's address is   25420 PRADO DE LAS PERAS, CALABASAS, CA 91302
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is  WASHINGTON MUTUAL BANK, FA

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of  THE UNITED STATES OF AMERICA

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3005 1/01

VMP ®-6(CA) (0207)
Page 1 of 15                    Initials: TF
VMP MORTGAGE FORMS - (800)521-7291

2069-95-16

EXHIBIT "1"
21

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is  CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

(E) "Note" means the promissory note signed by Borrower and dated JULY 11, 2007
The Note states that Borrower owes Lender ONE MILLION NINE HUNDRED SIXTY THOUSAND AND 00/100                                                                Dollars
(U.S. $   1,960,000.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 01, 2037

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

Initials: TF

-6(CA) (0207)                    Page 2 of 15                        Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan
does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property,
whether or not that party has assumed Borrower's obligations under the Note and/or this Security
Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals,
extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and
agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably
grants and conveys to Trustee, in trust, with power of sale, the following described property
located in the COUNTY                     of  LOS ANGELES                                       ;
             [Type of Recording Jurisdiction]         [Name of Recording Jurisdiction]
        THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT
        AND IS MADE A PART HEREOF.


                         SEE EXHIBIT A




Parcel ID Number:                                  which currently has the address of
25420 PRADO DE LAS PERAS                                                     [Street]
CALABASAS                                  [City], California 91302    [Zip Code]
("Property Address"):

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all
easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements
and additions shall also be covered by this Security Instrument. All of the foregoing is referred to
in this Security Instrument as the "Property."

        BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed
and has the right to grant and convey the Property and that the Property is unencumbered, except
for encumbrances of record. Borrower warrants and will defend generally the title to the Property
against all claims and demands, subject to any encumbrances of record.

        THIS SECURITY INSTRUMENT combines uniform covenants for national use and
non-uniform covenants with limited variations by jurisdiction to constitute a uniform security
instrument covering real property.

        UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

        1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late
Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

⊗-6(CA) (0207)              Page 3 of 15            Initials: TF         Form 3005 1/01

Reviewer ID: Eabunmi_Fadairo_2017-03-23_12:45:04

5

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

$-6(CA)$ (0207)                          Page 4 of 15                     Initials: TE                    Form 3005 1/01

EXHIBIT "1"
24
Reviewer ID: Fabunmi_Fadairo_2017-03-23_10:45:04

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: TF

-6(CA) (0207)    Page 5 of 15    Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

Initials: TF

6(CA) (0207)                    Page 6 of 15                    Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

-6(CA) (0207)                     Page 7 of 15          Initials: _____        Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Initials: _TF_

-6(CA) (0207)   Page 8 of 15   Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

<table>
<tr><td>⊕ -6(CA) (0207)</td><td>Page 9 of 15</td><td>Initials: JF</td><td>Form 3005 1/01</td></tr>
</table>

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

VMP -6(CA) (0207)　　　　　　　Page 10 of 15　　　　Initials: TF　　　　Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

Initials: TF

@D -6(CA) (0207)                    Page 11 of 15                                            Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

13

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

Initials: TF

VMP®-6(CA) (0207)     Page 12 of 15     Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

14

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

-6(CA) (0207)                    Page 13 of 16         Initials: TF            Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

15

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____    _____ (Seal)
                                                  -Borrower
                         TOMER FRIDMAN

_____    _____ (Seal)
                                                  -Borrower

_____ (Seal)              _____ (Seal)
            -Borrower                             -Borrower

_____ (Seal)              _____ (Seal)
            -Borrower                             -Borrower

_____ (Seal)              _____ (Seal)
            -Borrower                             -Borrower

-6(CA) (0207)              Page 14 of 15              Form 3005 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

16

State of California
County of LOS ANGELES                                    } ss.

On        7/11/07                  before me, *Corina Esperanza Castillo*
                                              Notary Public  /personally appeared
TOMER FRIDMAN


personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

_____ (Seal)

CORINA ESPERANZA CASTILLO
Commission # 1468592
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2008


-6(CA) (0207)              Page 15 of 15        Initials: TF        Form 3005 1/01

EXHIBIT "1"
35
Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Order No

## EXHIBIT "A"

## LEGAL DESCRIPTION

17

PARCEL 1:

LOT 16 OF TRACT NO. 35596-13, IN THE CITY OF CALABASAS, COUNTY OF LOS ANGELES,
STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 1285 PAGE 35 THROUGH 39 INCLUSIVE
OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

NONEXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, USE, ENJOYMENT, DRAINAGE,
ENCROACHMENT, SUPPORT, MAINTENANCE, REPAIRS, AND FOR OTHER PURPOSES, ALL AS
DESCRIBED IN THE MASTER DECLARATION AND THE DECLARATION.

LGLDESC1 - 04/28/89

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

RMTA
M39

18

# ADJUSTABLE RATE RIDER
## (12-MTA Index - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this ____11TH____ day of
__JULY, 2007_____, and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same
date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the
"Note") to ___WASHINGTON MUTUAL BANK, FA_____ (the "Lender") of the
same date and covering the property described in the Security Instrument and located at:

__25420 PRADO DE LAS PERAS, CALABASAS, CA  91302_____
(PROPERTY ADDRESS)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT
INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL
AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY
BORROWED, BUT NOT MORE THAN _115%____ OF THE ORIGINAL AMOUNT (OR
$___2,254,000.00_____). MY INTEREST RATE CAN NEVER EXCEED THE
LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT
MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up
until the first day of the calendar month that immediately precedes the first payment due date set
forth in Section 3 of the Note, I will pay interest at a yearly rate of ___7.705_%. Thereafter until the
first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate of
__1.200__%. The interest rate I will pay will thereafter change in accordance with Section 4 of the
Note.

(VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

4.    **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the ___1ST___ day of ___SEPTEMBER, 2007___, and on that day every month thereafter. Each such day is called a "Change Date".

(B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___TWO AND 70/100___ percentage points ___2.700___ % ("Margin") to Current Index. The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). The difference will be rounded to the next higher 1/8 of 1%.

(D) Interest Rate Limit

My interest rate will never be greater than ___10.250___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

(E) Payment Change Dates

Effective every year commencing ___SEPTEMBER 01, 2008___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to __115%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __115%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

Page 3 of 5                                    (VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

RMT2

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

Page 4 of 6

(VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



If Lender exercises this option, Lender shall give Borrower notice of acceleration. The
notice shall provide a period of not less than 30 days from the date the notice is given in
accordance with Section 15 within which Borrower must pay all sums secured by this Security
Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender
may invoke any remedies permitted by this Security Instrument without further notice or
demand on Borrower.

Page 5 of 6                                    (VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

_Tomer Fridman_
TOMER FRIDMAN

_____

_____    _____

_____    _____

_____    _____

Page 6 of 6                                    (VERSION 1.0)

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

24

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this    11TH    day of
JULY, 2007    , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of
the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to

WASHINGTON MUTUAL BANK, FA
                                                    (the "Lender")
of the same date and covering the Property described in the Security Instrument and located at:

25420 PRADO DE LAS PERAS, CALABASAS, CA 91302

[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS AND RESTRICTIONS

(the "Declaration"). The Property is a part of a planned unit development known as

THE OAKS AT CALABASAS
[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners
Association") and the uses, benefits and proceeds of Borrower's interest.
    PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
    A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

⊗ -7R (0008)       Form 3150 1/01
Page 1 of 3       Initials: T F
VMP MORTGAGE FORMS - (800)521-7291



Reviewer ID: Fabunmi_Fadairo_2017-03-23 16:45:04

25

incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. **Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

Initials: TF

-7R (0008)                         Page 2 of 3                         Form 3150 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-23_10:45:04

$2^b$

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)        _____ (Seal)
                    -Borrower                                  -Borrower
                                       TOMER FRIDMAN

_____ (Seal)        _____ (Seal)
                    -Borrower                                  -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                                  -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                                  -Borrower

@D₀-7R (0008)                 Page 3 of 3                 Form 3150 1/01

Reviewer ID: Fabunmi_Fadairo_2017-03-28_12:45:04



Loan Number

# LOAN MODIFICATION AGREEMENT

Borrower ("I")[1]: **TOMER FRIDMAN**
Lender ("Lender"): **CHASE HOME FINANCE LLC**
Date of First Lien Security Instrument (the "Mortgage") and Note (the "Note"): **JULY 11, 2007**
Loan Number: ▮▮▮▮▮ (the "Loan")
Property Address: **25420 PRADO DE LAS PERAS, CALABASAS, CALIFORNIA 91302** (the "Property")

If my representations in Section 1 continue to be true in all material respects, then the provisions of Section 2 of this Loan Modification Agreement ("Agreement") will, as set forth in Section 2, amend and supplement (i) the Mortgage on the Property, and (ii) the Note secured by the Mortgage. The Mortgage and Note together, as may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement have the meaning given to them in the Loan Documents.

I have provided confirmation of my financial hardship and documents to permit verification of all of my income to determine whether I qualify for the offer described in this Agreement. This Agreement will not take effect unless and until the Lender signs it.

1.  **My Representations.** I represent to the Lender and agree:

    A.  I am experiencing a financial hardship, and as a result, am either in default under the Loan Documents or a default is imminent.

    B.  The Property is neither in a state of disrepair, nor condemned.

    C.  There has been no change in the ownership of the Property since I signed the Loan Documents.

    D.  I am not a party to any litigation involving the Loan Documents, except to the extent I may be a defendant in a foreclosure action.

    E.  I have provided documentation for all income that I earn.

    F.  All documents and information I provide pursuant to this Agreement are true and correct.

2.  **The Modification.** The Loan Documents are hereby modified as of **SEPTEMBER 01, 2010** (the "Modification Effective Date"), and all unpaid late charges are waived. The Lender agrees to suspend any foreclosure activities so long as I comply with the terms of the Loan Documents, as modified by this Agreement. The Loan Documents will be modified, and the first modified payment will be due on the date set forth in this Section 2:

    A.  The Maturity Date will be: **AUGUST 01, 2050.**

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

▮▮▮▮▮ LOAN MODIFICATION AGREEMENT - CHAMP   ver. ▮▮▮▮▮   Page 1 of 5 pages

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Loan Number

B.  The modified principal balance of my Note will include all amounts and arrearages that will
be past due (excluding unpaid late charges) and may include amounts towards taxes,
insurance, or other assessments. The new principal balance of my Note is **$2,236,154.40** (the
"New Principal Balance").

C.  **$419,000.00** of the New Principal Balance shall be deferred (the "Deferred Principal
Balance"), and I will not pay interest or make monthly payments on this amount. The New
Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest
Bearing Principal Balance," and this amount is **$1,817,154.40**. The Interest Bearing Principal
Balance will re-amortize over **480 months**.

Interest will begin to accrue as of **AUGUST 01, 2010**. The first New monthly payment on the
New Principal Balance will be due on **SEPTEMBER 01, 2010**, and monthly on the same date
thereafter.

This Section 2.C does Not apply To the repayment of any Deferred Principal Balance And
such a balance will be repaid In accordance With Section 2.D. My payment schedule For the
modified Loan Is As follows:

I promise to pay monthly payments according to the following schedule with respect to the
Interest Bearing Principal Balance.

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal & Interest Payment Amount | Payment Begins on | Number of Monthly Payments |
|-------|---------------|---------------------------|---------------------------------------------|-------------------|----------------------------|
| 1-5 | 2.000% | 08/01/2010 | $5,502.81 | 09/01/2010 | 60 |
| 6 | 3.000% | 08/01/2015 | $6,392.98 | 09/01/2015 | 12 |
| 7 | 4.000% | 08/01/2016 | $7,332.62 | 09/01/2016 | 12 |
| 8-40 | 4.750% | 08/01/2017 | $8,063.22 | 09/01/2017 | 396 |

The Lender will notify me of the payment amount prior to the date that the monthly payment
on the Interest Bearing Principal Balance will change.
The Deferred Principal Balance of **$419,000.00** will be due on the maturity date unless due
earlier in accordance with Section 2.D.

The above terms in this Section 2.C shall supersede any provisions to the contrary in the Loan
Documents, including but not limited to provisions for an adjustable or step interest rate.

D.  I agree to pay in full (i) the Deferred Principal Balance, if any; and (ii) any other amounts still
owed under the Loan Documents, by the earliest of the date I sell or transfer an interest in the

LOAN MODIFICATION AGREEMENT - CHAMP   ver.                    Page 2 of 5 pages

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Property, subject to Section 3.E below, the date I pay the entire Interest Bearing Principal
Balance, or the Maturity Date.

E. I will be in default if I do not (i) pay the full amount of a monthly payment on the date it is
due, or (ii) comply with the terms of the Loan Documents, as modified by this Agreement. If
a default rate of interest is permitted under the current Loan Documents, then in the event of
default, the interest that will be due on the Interest Bearing Principal Balance will be the rate
set forth in Section 2.C, and there will be no interest payable on the Deferred Principal
Balance, if any.

F. If I make a partial prepayment of principal, the Lender may apply that partial prepayment
first to any remaining Deferred Principal Balance before applying such partial prepayment to
other amounts due under this Agreement or the Loan Documents.

3.   Additional Agreements. I agree to the following:

A. That this Agreement shall supersede the terms of any modification, forbearance, or
workout plan, if any, that I previously entered into with the Lender.

B. To comply, except to the extent that they are modified by this Agreement, with all
covenants, agreements, and requirements of the Loan Documents including my agreement
to make all payments of taxes, insurance premiums, assessments, impounds, and all other
payments, the amount of which may change periodically over the term of my Loan. This
Agreement does not waive future escrow requirements. If the Loan includes collection for
tax and insurance premiums, this collection will continue for the life of the Loan.

C. That the Loan Documents are composed of valid, binding agreements, enforceable in
accordance with their terms and are hereby reaffirmed.

D. That all terms and provisions of the Loan Documents, except as expressly modified by
this Agreement, remain in full force and effect; nothing in this Agreement shall be
understood or construed to be a satisfaction or release in whole or in part of the
obligations contained in the Loan Documents; and that except as otherwise specifically
provided in, and as expressly modified by, this Agreement, the Lender and I will be bound
by, and will comply with, all of the terms and provisions of the Loan Documents.

E. That, as of the Modification Effective Date, notwithstanding any other provision of the
Loan Documents, I agree as follows: If all or any part of the Property or any interest in it
is sold or transferred without the Lender's prior written consent, the Lender may, at its
option, require immediate payment in full of all sums secured by the Mortgage. However,
the Lender shall not exercise this option if federal law prohibits the exercise of such
option as of the date of such sale or transfer. If the Lender exercises this option, the
Lender shall give me notice of acceleration. The notice shall provide a period of not less
than thirty (30) days from the date the notice is delivered or mailed within which I must
pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of
this period, the Lender may invoke any remedies permitted by the Mortgage without

[REDACTED]          LOAN MODIFICATION AGREEMENT - CHAMP   ver: [REDACTED]          Page 3 of 5 pages

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Loan Number ████████████

further notice or demand on me.

F.  That, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

G.  If any document is lost, misplaced, misstated, or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after my receipt of the Lender's request, I will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). If I fail to do so, I will be liable for any and all loss or damage which the Lender reasonably sustains as a result of my failure.

H.  All payment amounts specified in this Agreement assume that payments will be made as scheduled.

I.  If the Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, the Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

J.  That in agreeing to the changes to the original Loan Documents as reflected in this Agreement, the Lender has relied upon the truth and accuracy of all of the representations made by the Borrower(s), both in this Agreement and in any documentation provided by or on behalf of the Borrower(s) in connection with this Agreement. If the Lender subsequently determines that such representations or documentation were not truthful or accurate, the Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

K.  I acknowledge and agree that if the Lender executing this Agreement is not the current holder or owner of the Note and Mortgage, that such party is the authorized servicing agent for such holder or owner, or its successor in interest, and has full power and authority to bind itself and such holder and owner to the terms of this modification.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

████████ LOAN MODIFICATION AGREEMENT - CHAMP    ver. ████████    Page 4 of 5 pages

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

Loan Number

_____[Space Below This Line For Borrower Acknowledgement]_____

Tomer Fridman                                    Date: 7 / 20 / 2010
Borrower - TOMER FRIDMAN

_____[Space Below This Line For Corporate Acknowledgement]_____

**CHASE HOME FINANCE LLC**
Lender

By: Patricia C. McLaughlin

Date: 07 . 29 . 10

EXHIBIT "1"

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



| Customer Service Center | 1-800-848-9136 |
| Monday - Friday | 8 a.m. - 12 a.m.(ET) |
| Saturday | 8 a.m. - 8 p.m. (ET) |
| Hearing Impaired (TDD) | 1-800-582-0542 |





TOMER FRIDMAN
25420 PRADO DE LAS PERAS
CALABASAS CA 91302-3656

### Escrow: Taxes and Insurance Statement

| Loan Number | |
| --- | --- |
| Statement Date | 12/27/2016 |
| Review Period | 07/2016 to 12/2016 |
| Escrow Shortage | $0.00 |

### Important Message

If you are in bankruptcy or have been given a discharge for your bankruptcy, this letter is for information only. This letter is not an attempt to collect a debt. It is not an attempt to collect, assess or recover all or part of the debt from you. If a bankruptcy trustee is making your payments for you, please give a copy of this statement to the trustee.

Your escrow shortage amount does not include any actual shortage that might have been included before you filed for bankruptcy.

### Monthly Home Loan Payment

| | Current Payment | New Payment Effective 01/01/2017 |
| --- | --- | --- |
| Principal & Interest | $6,392.98 | $7,332.62 |
| Escrow Account Deposit | $0.02 | $2,759.22 |
| Total Payment Amount | $6,393.00 | $10,091.84 |

### Summary

**Your escrow account is balanced.**

You have exactly the amount of money in your escrow account needed to pay your estimated property taxes and/or insurance for next year. Keep this statement for your records. You do not need to do anything else.

Your monthly payment will be $10,091.84 starting 01/01/17.



EXHIBIT "1"
51

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



## Balancing Your Escrow Account

There needs to be enough money in your escrow account to pay your property taxes and/or insurance. To do that, federal law allows us to require that you keep a minimum balance in your account. This cash reserve helps to cover any increase in taxes and/or insurance. However, the minimum balance requirement has been waived for your account.

The payments made to and from your escrow account last year help predict your account activity for next year. This year's activity also helps predict what your lowest account balance is likely to be.[1]

To balance your escrow account, we compare what your lowest account balance will likely be next year with your minimum required balance. If there is no difference between the numbers, your escrow account is balanced.

| $0.00 | Your minimum required balance |
| S-27,117.52 | Your estimated lowest account balance for 2017[1] |
| **$0.00** | **Your escrow account is balanced** |

[1] See the "Estimated Escrow Account Activity" chart in this statement.

## Escrow Account History

The chart below compares this year's activity on your escrow account with our estimates. The estimated amounts came from your last escrow account review.

- Your most recent mortgage payment due was $6,393.00. Your mortgage payment includes principal and interest $6,392.98 and escrow money $0.02.

- At the time of your last escrow account review, your expected lowest balance was $0.00. The chart below shows that your actual lowest escrow balance was S-20,776.10.

Note: changes in property taxes or insurance premiums create the difference between the estimated and actual amounts in the chart. An "E" in the chart below means expected activity that hasn't occurred yet.

*Indicates a difference between the estimated and actual amounts.

### This Year: July 2016 to December 2016

| Date | Activity | Estimated Amount | Actual Amount | | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|---|
| | Starting Balance | | | | $8,260.28 | S-2,265.71 |
| 07/2016 | Deposit | $2,753.43 | $0.00 | * | $11,013.71 | S-2,265.71 |
| 08/2016 | Deposit | $2,753.43 | $0.00 | * | $13,767.14 | S-2,265.71 |
| 09/2016 | Deposit | $2,753.43 | $0.00 | * | $16,520.57 | S-2,265.71 |
| 10/2016 | Deposit | $2,753.43 | $0.00 | * | $19,274.00 | S-2,265.71 |
| 11/2016 | Deposit | $2,753.43 | $0.00 | * | | |
| | Withdrawal - COUNTY TAX | $14,586.50 | $14,619.24 | * | $7,440.93 | S-16,884.95 |
| 11/2016 | Withdrawal - HOMEOWNER IN | | $3,891.15 | * | $7,440.93 | S-20,776.10 |
| 12/2016 | Deposit | $2,753.43 | $0.16 | E | | |
| | Withdrawal - HOMEOWNER IN | $3,868.15 | $0.00 | E | $6,326.21 | S-20,775.94 |
| 01/2017 | Deposit | $2,753.43 | $0.00 | * | $9,079.64 | $0.00 |
| 02/2017 | Deposit | $2,753.43 | $0.00 | * | $11,833.07 | $0.00 |
| 03/2017 | Deposit | $2,753.43 | $0.00 | * | | |
| | Withdrawal - COUNTY TAX | $14,586.50 | $0.00 | * | $0.00 | $0.00 |
| 04/2017 | Deposit | $2,753.43 | $0.00 | * | $2,753.43 | $0.00 |

**(Continued)**

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



Escrow: Taxes and Insurance Statement

| | |
|---|---|
| Loan Number | |
| Statement Date | 12/27/2016 |
| Review Period | 07/2016 to 12/2016 |
| **Escrow Shortage** | **$0.00** |



TOMER FRIDMAN
25420 PRADO DE LAS PERAS
CALABASAS CA 91302-3656

## This Year: July 2016 to December 2016 (continued)

| Date | Activity | Estimated Amount | Actual Amount | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|
| 05/2017 | Deposit | $2,753.43 | $0.00 * | $5,506.86 | $0.00 |
| 06/2017 | Deposit | $2,753.43 | $0.00 * | $8,260.29 | $0.00 |
| | Total Deposits | $33,041.16 | $0.16 | | |
| | Total Withdrawals | $33,041.15 | $18,510.39 | | |
| | Account Balance as of 12/2016 | | | | S-20,775.94 |

## Expected Escrow Account Activity

The chart below estimates your escrow account balance for the next 12 months with your new monthly escrow account deposit of $2,759.22 and any anticipated withdrawals. The chart shows that you will reach your estimated lowest account balance of S-27,117.52 in March 2017 (highlighted below). That is equal to your minimum required balance of $0.00.

## Next Year: January 2017 to December 2017

| Date | Activity | Estimated Amount | Actual Amount | Estimated Escrow Balance | Actual Escrow Balance |
|---|---|---|---|---|---|
| | Starting Balance | | | | S-20,775.94 |
| 01/2017 | Deposit | $2,759.22 | | S-18,016.72 | |
| 02/2017 | Deposit | $2,759.22 | | S-15,257.50 | |
| 03/2017 | Deposit Withdrawal - COUNTY TAX | $2,759.22 $14,619.24 | | S-27,117.52 | |
| 04/2017 | Deposit | $2,759.22 | | S-24,358.30 | |
| 05/2017 | Deposit | $2,759.22 | | S-21,599.08 | |
| 06/2017 | Deposit | $2,759.22 | | S-18,839.86 | |
| 07/2017 | Deposit | $2,759.22 | | S-16,080.64 | |
| 08/2017 | Deposit | $2,759.22 | | S-13,321.42 | |
| 09/2017 | Deposit | $2,759.22 | | S-10,562.20 | |
| 10/2017 | Deposit | $2,759.22 | | S-7,802.98 | |
| 11/2017 | Deposit Withdrawal - COUNTY TAX | $2,759.22 $14,619.24 | | S-19,663.00 | |
| 12/2017 | Deposit Withdrawal - HOMEOWNER IN | $2,759.22 $3,872.15 | | S-20,775.93 | |
| | Total Estimated Deposits | $33,110.64 | | | |
| | Total Estimated Withdrawals | $33,110.63 | | | |
| | Estimated Account Balance as of December 2017 | | | | S-20,775.93 |

## Expected Escrow Account Payments

This section reflects the escrow activity that is expected to occur in the next 12 months. The "Total Tax and Insurance Monthly Payment Amount" at the bottom of this chart is your new monthly escrow deposit, as listed on page 1 of this statement.

| Tax | | | Insurance | | |
|---|---|---|---|---|---|
| Item | Annual Expense | Anticipated Date(s) of Payment | Item | Annual Expense | Anticipated Date(s) of Payment |
| COUNTY TAX | $14,619.24 | March 17 | HOMEOWNER IN | $3,872.15 | December 17 |
| COUNTY TAX | $14,619.24 | November 17 | | | |

Total Tax and Insurance Monthly Payment Amount = $2,759.22

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



**This Page Intentionally Left Blank**

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



A QUICK GUIDE TO UNDERSTANDING YOUR

# Annual Escrow Analysis



**Current Monthly Mortgage Payment**

**New Monthly Mortgage Payment**

**Escrow Account Summary**

This section shows if your escrow account is balanced, or if it has a surplus or a shortage. If you have a shortage, it explains your options to pay the difference. If you have a surplus of more than $50, your refund check is attached.

**Escrow Shortage Coupon or Surplus Check**

If you have a shortage, you can use this coupon to mail a full or partial payment of your escrow shortage. You can also pay all or part of your shortage at chase.com. If you have a surplus, your surplus check will be attached here. Please detach and cash it.

**Escrow Account History**

The activity for your escrow account from the past year is shown here, along with what we estimated your payments would be.

**Expected Escrow Activity for Next Year**

We've calculated what we expect your escrow account balance will be for the upcoming year, based on your current tax and insurance expenses. However, your account could have a shortage or a surplus at the end of the upcoming year, if your tax and/or insurance costs change.

**Expected Escrow Payment for Next Year**

These are the tax and/or insurance amounts we expect to pay in the next 12 months, and when we expect to pay them. If you believe information is missing or incorrect, please call us at 1-800-848-9136.

EXHIBIT "1"

55

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04



### FREQUENTLY ASKED QUESTIONS

**Why am I getting an Escrow Analysis?**

We run your Escrow Analysis annually so you know the amount of taxes and/or insurance we paid for you this past year with funds from your escrow account. We also include what we expect to pay next year.

**How is my monthly escrow payment calculated?**

Each year, we project how much you'll need in your escrow account to pay your taxes and/or insurance for the upcoming year, based on your taxes and/or insurance at the time of your Escrow Analysis. You pay a portion of the total projected escrow amount each month with your mortgage payment. We then use those escrow funds to pay your taxes and/or insurance on your behalf.

If your taxes and/or insurance change during the next 12 months, you could have a shortage or surplus in your account when we run next year's analysis.

**What is an escrow minimum balance?**

For most accounts, the minimum required balance is equal to two months of escrow payments. This minimum balance helps cover any increases in your taxes and/or insurance over the next year.

### ESCROW RESOURCES

- View your annual Escrow Analysis online to see if your monthly mortgage payment is changing due to an increase or decrease in your property taxes and/or insurance at **chase.com/EscrowAnalysis.**

- For answers to more questions and to watch our informational video, visit **chase.com/Escrow.**

- To stay informed about activity from your escrow account throughout the year, sign up for free escrow alerts at **chase.com/Alerts.**

©2015 JPMorgan Chase & Co.



EXHIBIT "1"
56

Reviewer ID: Fabunmi_Fadairo_2017-03-23_12:45:04

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**MALCOLM & CISNEROS, A Law Corporation**
**2112 Business Center Drive, Second Floor**
**Irvine CA 92612**

A true and correct copy of the foregoing document described as **PROOF OF CLAIM** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner entitled below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 24, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

William H Brownstein: Brownsteinlaw.bill@gmail.com
Daniel A Fujimoto: wdk@wolffirm.com
Todd S Garan: ch11ecf@aldridgepite.com,TSG@ecf.inforuptcy.com; tgaran@aldridgepite.com
Jamie D Hanawalt: ecfcacb@aldridgepite.com, jhanawalt@ecf.inforuptcy.com
Erica T Loftis: Erica.Loftis@BuckleyMadole.com, Susana.Hernandez@BuckleyMadole.com
William F McDonald: Caecf@tblaw.com, wfm@tblaw.com;snchampney@tblaw.com
Henry D Paloci: hpaloci@hotmail.com, hpaloci@calibankruptcy.com
Kelly M Raftery: bknotice@mccarthyholthus.com, kraftery@ecf.courtdrive.com
S Margaux Ross: margaux.ross@usdoj.gov
Valerie Smith: claims@recoverycorp.com
United States Trustee (SV): ustpregion16.wh.ecf@usdoj.gov
Gilbert R Yabes: ecfcacb@aldridgepite.com,GRY@ecf.inforuptcy.com;gyabes@aldridgepite.com
Kristin A Zilberstein: bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com; kzilberstein@ecf.inforuptcy.com

☐  Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL:**
On **March 24, 2017** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Tomer Fridman 25420 Prado De Las Peras, Calabasas, CA 91302**

**William Brownstein, 11755 Wilshire Blvd., Ste 1250, Los Angeles, CA 90025-1540**

**Daimler Trust, c/o BK servicing, LLC, PO Box 131265, Roseville, MN 55113**

☐  Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following persons and/or entities by personal delivery, overnight mail service or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 24, 2017 | Allen Sifuentes | _Allen Sif_ |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California
June 2012                                                                                     F 9013-3.1.PROOF.SERVICE

EXHIBIT "1"
57

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
11755 Wilshire Boulevard, Suite 1250, Los Angeles, CA  90025-1540

A true and correct copy of the foregoing document entitled (*specify*):  DECLARATION OF WILLIAM H.
BROWNSTEIN REGARDING MOTION FOR VALUATION OF REAL PROPERTY LOCATED AT
3915 PRADO DEL MAIZ, CALABASAS AND EXHIBIT will be served or was served **(a)** on the judge in
chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
03/27/2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**See NEF for confirmation of electronic transmission to the U.S. Trustee and any trustee in this case, and to any
attorneys who receive service by NEF.**

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) 03/27/2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case
or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first
class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge
will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 03/27/2017, I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

The Honorable Martin R. Barash, 21041 Burbank Boulevard, Courtesy Box, Woodland Hills, CA  91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 03/27/2017 | William H. Brownstein | *William H. Brownstein* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.