CHRISTOPHER M. MCDERMOTT (SBN 253411)
cmcdermott@aldridgepite.com
TODD S. GARAN (CA SBN 236878)
tgaran@aldridgepite.com
**ALDRIDGE PITE, LLP**
4375 Jutland Dr., Ste. 200
P.O. Box 19734
San Diego, CA 92177-9734
Telephone: (858) 750-7600
Facsimile:  (619) 590-1385

Attorneys for Secured Creditor:
Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual
capacity but as Trustee of ARLP Trust 3; Fay Servicing, LLC as servicer

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA – SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No.  1:16-bk-11729-MB |
| TOMER FRIDMAN, | Chapter 11 |
| Debtor and Debtor in Possession | **OPPOSITION TO DEBTOR'S HEARING/MOTION TO VALUE REAL PROPERTY** |
| | **Subject Property:**<br>*3915 Prado Del Maiz*<br>*Calabasas, California 91302-3633* |
| | Date:      April 10, 2016<br>Time:     1:30 p.m.<br>Rm:        303<br>            21041 Burbank Blvd.<br>            Woodland Hills, CA<br>Judge:    Hon. Martin R. Barash |

Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual

capacity but as Trustee of ARLP Trust 3; Fay Servicing, LLC as servicer (hereinafter, "**Creditor**")

hereby submits its opposition ("**Opposition**") to the valuation of the real property commonly known

as 3915 Prado Del Maiz, Calabasas, California 91302-3633 (the "**Subject Property**") in the above

referenced matter with respect to the.

/./

/././

## I.    <u>STATEMENT OF FACTS</u>

The Loan is evidenced by a promissory note dated July 2, 2007, executed by Debtor to Countrywide Bank, FSB ("**Lender**") in the amount of $1,470,000.00 (the "**Note**").  A copy of Creditor's Proof of Claim is attached hereto as **Exhibit A** and incorporated herein by reference.

The Note is secured by a Deed of Trust (the "**Deed of Trust**") granting Lender a security interest in the Subject Property, which is more fully described in the Deed of Trust.  The Deed of Trust was duly recorded July 16, 2007, in the official records of the Los Angeles County Recorder's office, State of California.  *See, Exhibit A*.  The Note and Deed of Trust may be referred to collectively herein as the "**Loan**."  Subsequently, all of Lenders beneficial interest in the Loan was assigned to Creditor.

On or about June 9, 2016, Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California and was assigned Case No. 1:16-bk-11729-MB.  On December 20, 2016, Debtor's case was converted to Chapter 11.  *See, Docket Number 50*.

Creditor filed a Proof of Claim against the Debtor's estate in the amount of $2,108,528.70 secured by the Subject Property, with $232,017.39 in prepetition arrears.  A copy of Creditor's Proof of Claim may be found with this Court's Claims Register as Claim No.14.

On March 27, 2017, Debtor filed a Notice of Continuance of Hearing on Motion to Value ("**Notice**") the Subject Property and Declaration in Support thereof.  *See, Docket Numbers 102, and 101, respectively*.

A review of the Notice, Declaration and Court's Docket; however, indicates that Debtor has not filed a Motion to Value as to the Subject Property, but instead other real property of Debtor's Estate located and identified as 25420 Prado de las Peras, Calabasas, CA 91302 ("**25420 Prado Property**").  *See, Docket Number 62*.  Indeed, the Declaration filed a *Docket Number 102* does not discuss or address the Subject Property, and the appraisal attached thereto solely references the 25420 Prado Property.  *Id*.

Creditor files this Opposition out of an abundance of caution.

2
--

## II.    ARGUMENT

**A.    CREDITOR IS SEEKING CLARIFICATION FROM DEBTOR AND/OR THE COURT THAT NO MOTION TO VALUE THE SUBJECT PROPERTY IS CURRENTLY ON FILE WITH THE COURT'S DOCKET OR SERVED ON CREDITOR.**

Creditor suspects the Notice of Continued Hearing and Declaration filed at *Docket Numbers 101 and 102* incorrectly identified Creditor's Subject Property as opposed to the 25420 Prado Property, but is seeking confirmation from Debtor's counsel regarding the same by way of a Notice of Errata filed with the Court.

**B.    CREDITOR IS RESERVING ITS RIGHT TO OPPOSE ANY VALUATION OF THE SUBJECT PROPERTY AND OBTAIN A FULL APPRAISAL.**

In the event the Court has set a  hearing on the value of Creditor's Subject Property for whatever reason, the Creditor is respectfully requesting Debtor file a Motion to Value with respect to this specific Subject Property so that Creditor has an opportunity to obtain its own current full appraisal for the Subject Property.

### 1. **Legal Standard**:

11 U.S.C. § 506(a)(1) provides that an allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.  The Bankruptcy Code does not specify the appropriate date to use in valuing collateral, but Section 506(a)(1) instead provides:

> "…*Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest*"

§506(a)(1) (emphasis added). [1]

---

[1] As the legislative history of §506(a) indicates, "…courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of property or on a plan affecting a creditor's interest.  To illustrate, a valuation early in the case in a proceeding under sections 361-363 *would not be binding upon the debtor or creditor at the time of confirmation* of the plan." Sen.R No.989, 95th Cong.,2d Sess. 68 (1978).

**OPPOSITION TO MOTION TO VALUE REAL PROPERTY**

1       Congress envisioned a flexible approach to valuation whereby bankruptcy courts would

2  choose the standard that best fits the circumstances and that considered the proposed disposition or

3  use of the collateral is of paramount importance to the valuation.  *In re SW Boston Hotel Venture,*

4  *LLC*, 2014 WL 1399418, pg. 8 (1st Cir); *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3rd Cir.

5  2012) (citing to *Associates Commercial Corp. v. Rash*, 520 U.S. 953 at 962, 117 S.Ct. 1879, 138

6  L.Ed.2d 148 (1997)); *In re Cahill*, 503 B.R. 535, 540 (Bankr. D.N.H 2013).  Indeed, courts have

7  long recognized the value of real property securing a claim, and by implication, the amount of the

8  secured claim, can change throughout the course of a bankruptcy proceeding.  See, *Dewsnup v.*

9  *Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed2d 903 (1992); *In re Ahlers*, 794 F.2d 388, 398 (8th Cir.

10  1986), rev'd on other grounds, 485 U.S. 197 (1988) (In determining feasibility of a chapter 11 plan,

11  value of collateral is determined at time for confirmation of the plan, and the initial valuation for

12  adequate protection purposes is not *res judicata* in determining value of collateral or secured claim);

13  *In re SW Boston Hotel Venture, LLC*, 2014 WL 1399418, pg. 11 (1st Cir) (Valuation for one

14  purposes at one point in bankruptcy proceeding has no binding effect on valuations performed at

15  other points in proceeding); *Fairchild v. Leganon Prod. Credit Ass'n (In re Fairchild)*, 31 B.R. 789

16  (Bankr. S.D. OH 1983)(A determination of the amount of a secured claim in one aspect of a

17  bankruptcy proceeding is not necessarily *res judicata* in other aspects of that proceeding).

18       A majority of the courts agree that for the purpose of determining the amount of a secured

19  creditor's claim in the context of a chapter 11 plan, the collateral should be valued as of effective

20  date of the plan.  *See, In re Ahlers*, 794 F.2d 388, 398 (8th Cir. 1986), rev'd on other grounds, 485

21  U.S. 197 (1988) (For purpose of the reorganization plan, the value of the collateral is to be

22  determined on the date of the confirmation hearing, or valuation hearing); *In re Heritage Highgate,*

23  *Inc.*, 679 F.3d 132, 142-143 (3rd Cir. 2012) (Where purpose of the valuation of collateral is to

24  determine the treatment of a claim by reorganization plan as secured or unsecured, the values

25  determined must be compatible with the values that will prevail on the plan's confirmation date); *In*

26  *re Hales*, 493 B.R. 861, 866 (Bankr. D. Utah 2013 (Chapter 11 plan confirmation date was

27  appropriate date for determining value of commercial real estate that debtors proposed to retain in

28  "cramdown" plan that stripped down liens of creditor whose claims were secured by this realty); *In*

4
--

1  *re Cahill*, 503 B.R. 535, 540 (Bankr. D.N.H 2013) (In deciding whether residential mortgaged

2  property had value in excess of amount of senior mortgage debt, such that there was at least some

3  equity to support junior mortgagee's lien…bankruptcy court would employ valuation date close in

4  time to confirmation, in order to give junior mortgagee, which bore the risk of having extended

5  credit to debtors, the benefit of any post-petition increase in value of property, which was allegedly

6  due to improvement in real estate market rather than actions of debtor); *In re Dheming*, 2013 WL

7  1195652 (Bankr. N.D. Cal); *In re Eblen*, 1991 WL 284108, at 2 (Bankr. N.D. Cal. 1991); *In re

8  Stanley*, 185 B.R. 417 (Bankr. D. Conn. 1995); *In re Seip*,116 B.R. 709, 710 (Bankr. D. Neb 1990)

9     Finally, the actual amount of Creditor's interest in the Subject Property at time of

10  confirmation is the market value of the Subject Property, *plus* the net amount of rents collected post-

11  petition and pre-confirmation and subject to the Deed of Trust.  *See, In re Ambanc La Mesa Ltd.*

12  *Partnership*, 115 F.3d 650, 654 (9th Cir. 1997).

13     In the present matter, in the event the Court did set a hearing on the valuation of the Subject

14  Property that Creditor is not aware of, Creditor disputes Debtor's value and is respectfully seeking

15  an opportunity to obtain its own full appraisal for the Subject Property, and Creditor requests

16  Debtor's cooperation in providing Creditor's appraiser access to the Subject Property to conduct a

17  full inspection should it be necessary.'

18     Otherwise, Creditor can simply wait until Debtor files a Motion to Value the Subject Property

19  in order to respond more appropriately.

20  WHEREFORE, Creditor respectfully requests:

21     1.    That the Debtor and/or Court Clarify whether any type of hearing on the

22     valuation of Creditor's Subject Property is on calendar and if not, confirm the same or

23     require Debtor to file and serve a Motion to Value;

24     2.    In the alternative, if the Court has set a hearing on the valuation of Creditor's

25     Subject Property, that the  hearing on Debtor's Motion be continued for 30 days to allow

26     Creditor an opportunity to obtain a full appraisal for the Subject Property and that Debtor

27     provide Creditor's appraiser access to the Subject Property for that purpose; and

28     3.    For such other and further relief as this Court deems just and proper.

5

Dated: April 7, 2017

ALDRIDGE PITE, LLP

By: /S/ *TODD S. GARAN* (CA SBN 236878)
TODD S. GARAN
Attorney for Creditor

**OPPOSITION TO MOTION TO VALUE REAL PROPERTY**

# EXHIBIT A

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | Tomer  Fridman |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central   District of   California (State) |
| Case number | 1:16-bk-11729-MB |

## Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

### Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. | Who is the current creditor? | Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual capacity but as Trustee of ARLP Trust 3 |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor       c/o Fay Servicing, LLC |

| | | |
|---|---|---|
| 2. | Has this claim been acquired from someone else? | ☐ No  ☑ Yes. From whom?       Ocwen Loan Servicing, LLC |

| | | | |
|---|---|---|---|
| 3. | Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Fay Servicing, LLC Bankruptcy Department Name | Fay Servicing, LLC Bankruptcy Department Name |
| | | 939 W. North Avenue Suite 680 Number        Street | 939 W. North Avenue Suite 680 Number        Street |
| | | Chicago, Illinois 60642 City            State      ZIP Code | Chicago, Illinois 60642 City            State      ZIP Code |
| | | Contact phone | Contact phone |
| | | Contact email | Contact email |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| | | |
|---|---|---|
| 4. | Does this claim amend one already filed? | ☑ No  ☐ Yes. Claim number on court claims registry (if known)             Filed on MM / DD/ YYYY |

| | | |
|---|---|---|
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No  ☐ Yes. Who made the earlier filing? |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: 6504

**7. How much is the claim?** $2,108,528.70 .   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?** Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as healthcare information.

Money Loaned

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

Nature of Property:

☑ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: 3915 Prado Del Maiz, Calabasas, California  91302

Basis for Perfection: Recordation of Lien

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $

Amount of the claim that is secured: $2,108,528.70

Amount of the claim that is unsecured: $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $232,017.39

Annual Interest Rate (when case was filed)   6.000000%

☐ Fixed
☑ Variable

**10. Is this claim based on a lease?**  ☑ No  ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

**11. Is this claim subject to a right of setoff?**  ☑ No  ☐ Yes. Identify the property: _____

Proof of Claim   **EXHIBIT A** Page 2

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | | **Amount entitled to priority** |
|---|---|---|---|
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C.§ 507(a)(7). | $ _____ |
| | | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |
| | | * Amounts are subject to adjustment on 04/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date      10/11/2016
                    MM / DD / YYYY

/s/ Andrew Kussmaul
        Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Andrew Kussmaul | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Authorized Agent for Fay Servicing, LLC | | |
| Company | Buckley Madole, P.C. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | P. O. Box 9013 | | |
| | Number      Street | | |
| | Addison | TX | 75001 |
| | City | State | ZIP Code |
| Contact phone | (972) 643-6600 | Email | POCInquiries@BuckleyMadole.com |

# Mortgage Proof of Claim Attachment

(12/15)

**If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.**

| Part 1: Mortgage and Case Information | Part 2: Total Debt Calculation | Part 3: Arrearage as of Date of the Petition | Part 4: Monthly Mortgage Payment |
|---|---|---|---|
| Case number: 1:16-bk-11729-MB | Principal balance: $1,915,591.12 | Principal & interest due: $195,438.46 | Principal & interest: $11,496.38 |
| Debtor 1: Tomer Fridman | Interest due: $165,318.58 | Prepetition fees due: $143.53 | Monthly escrow: $1,791.99 |
| Debtor 2: | Fees, costs due: $143.53 | Escrow deficiency for funds advanced: $27,475.47 | Private mortgage insurance: |
| Last 4 digits to identify: 6504 | Escrow deficiency for funds advanced: $27,475.47 | Projected escrow shortage: $8,959.93 | Total monthly payment: $13,288.37 |
| Creditor: Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual capacity but as Trustee of ARLP Trust 3 | Less total funds on hand: - $0.00 | Less funds on hand: - $0.00 | |
| Servicer: Fay Servicing, LLC | Total debt: $2,108,528.70 | Total prepetition arrearage: $232,017.39 | |
| Fixed accrual/daily simple interest/other: ARM | | | |

## Part 5: Loan Payment History from First Date of Default

| | | Account Activity | | | | | How Funds Were Applied / Amount Incurred | | | | | Balance After Amount Received or incurred | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. Date | B. Contractual payment amount | C. Funds received | D. Amount incurred | E. Description | F. Contractual due date | G. Prin, int & esc past due balance | H. Amount to principal | I. Amount to interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
| | | | | Starting Balance | | $0.00 | | | | | | $1,917,500.00 | $0.00 | $968.57 | $0.00 | $0.00 |
| 12/05/2014 | | $1,131.75 | | Payment Received | 01/01/2015 | $0.00 | | | | | $1,131.75 | $1,917,500.00 | $0.00 | $968.57 | $3,495.20 | $1,131.75 |
| 12/31/2014 | $1.45 | $1.45 | | Interest on Escrow Advance | 01/01/2015 | $0.00 | | | $1.45 | | | $1,917,500.00 | $0.00 | $970.02 | $3,495.20 | $1,131.75 |
| 01/01/2015 | $13,445.66 | | | Regular Payment Due | 01/01/2015 | $13,445.66 | | | | | | $1,917,500.00 | $0.00 | $970.02 | $3,495.20 | $1,131.75 |
| 01/30/2015 | | $14,020.48 | | Payment Applied | 02/01/2015 | $0.00 | $1,908.88 | $9,587.50 | $1,949.28 | $574.82 | | $1,915,591.12 | $0.00 | $2,919.30 | $2,920.38 | $1,131.75 |
| 02/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $11,496.38 | | | | | | $1,915,591.12 | $0.00 | $2,919.30 | $2,920.38 | $1,131.75 |
| 03/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $22,992.76 | | | | | | $1,915,591.12 | $0.00 | $2,919.30 | $2,920.38 | $1,131.75 |
| 03/13/2015 | | | $10,031.07 | Escrow Disbursement: County Tax | 02/01/2015 | $22,992.76 | | | | | | $1,915,591.12 | $0.00 | ($7,111.77) | $2,920.38 | $1,131.75 |
| 03/17/2015 | | ($1,131.75) | | Refund from Suspense | 02/01/2015 | $22,992.76 | | | | | ($1,131.75) | $1,915,591.12 | $0.00 | ($7,111.77) | $2,920.38 | $0.00 |
| 03/17/2015 | $1,131.75 | $1,131.75 | | Payment Received | 02/01/2015 | $22,992.76 | | | $1,131.75 | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,920.38 | $0.00 |

**EXHIBIT A**

4590-N-0232

**Mortgage Proof of Claim Attachment: Additional Page**     (12/15)

Case number:       1:16-bk-11729-MB

Debtor 1:       Tomer  Fridman

### Part 5: Loan Payment History from First Date of Default

| A. Date | B. Contractual payment amount | C. Funds received | D. Amount incurred | E. Description | F. Contractual due date | G. Prin, int & esc past due balance | H. Amount to principal | I. Amount to interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/27/2015 | | | $6.53 | Certified Mail/Copies Cost | 02/01/2015 | $22,992.76 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,926.91 | $0.00 |
| 04/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $34,489.14 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,926.91 | $0.00 |
| 04/09/2015 | | | $13.25 | Inspection Fee | 02/01/2015 | $34,489.14 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,940.16 | $0.00 |
| 04/28/2015 | | | $13.25 | Inspection Fee | 02/01/2015 | $34,489.14 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,953.41 | $0.00 |
| 05/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $45,985.52 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,953.41 | $0.00 |
| 06/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $57,481.90 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,953.41 | $0.00 |
| 06/02/2015 | | | $13.25 | Inspection Fee | 02/01/2015 | $57,481.90 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $2,966.66 | $0.00 |
| 06/25/2015 | | | ($2,874.10) | Late Fee Adjustment | 02/01/2015 | $57,481.90 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $92.56 | $0.00 |
| 06/25/2015 | | | ($39.75) | Late Fee Adjustment | 02/01/2015 | $57,481.90 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $52.81 | $0.00 |
| 06/25/2015 | | | ($6.53) | Late Fee Adjustment | 02/01/2015 | $57,481.90 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $46.28 | $0.00 |
| 07/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $68,978.28 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $46.28 | $0.00 |
| 07/23/2015 | | | $11.50 | Inspection Fee | 02/01/2015 | $68,978.28 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $57.78 | $0.00 |
| 08/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $80,474.66 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $57.78 | $0.00 |
| 08/28/2015 | | | $11.50 | Inspection Fee | 02/01/2015 | $80,474.66 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $69.28 | $0.00 |
| 08/28/2015 | | | $60.00 | Corporate Advance | 02/01/2015 | $80,474.66 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $129.28 | $0.00 |
| 09/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $91,971.04 | | | | | | $1,915,591.12 | $0.00 | ($5,980.02) | $129.28 | $0.00 |
| 09/14/2015 | | | $1,177.00 | Escrow Disbursement: Hazard Insurance | 02/01/2015 | $91,971.04 | | | | | | $1,915,591.12 | $0.00 | ($7,157.02) | $129.28 | $0.00 |
| 10/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $103,467.42 | | | | | | $1,915,591.12 | $0.00 | ($7,157.02) | $129.28 | $0.00 |
| 10/08/2015 | $8.37 | $8.37 | | Interest on Escrow Advance | 02/01/2015 | $103,467.42 | | | $8.37 | | | $1,915,591.12 | $0.00 | ($7,148.65) | $129.28 | $0.00 |
| 10/08/2015 | | | $60.00 | Corporate Advance | 02/01/2015 | $103,467.42 | | | | | | $1,915,591.12 | $0.00 | ($7,148.65) | $189.28 | $0.00 |
| 10/10/2015 | | | $12.50 | Inspection Fee | 02/01/2015 | $103,467.42 | | | | | | $1,915,591.12 | $0.00 | ($7,148.65) | $201.78 | $0.00 |
| 11/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $114,963.80 | | | | | | $1,915,591.12 | $0.00 | ($7,148.65) | $201.78 | $0.00 |
| 11/09/2015 | | | $10,163.42 | Escrow Disbursement: County Tax | 02/01/2015 | $114,963.80 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $201.78 | $0.00 |
| 11/19/2015 | | | $12.50 | Inspection Fee | 02/01/2015 | $114,963.80 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $214.28 | $0.00 |
| 12/01/2015 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $126,460.18 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $214.28 | $0.00 |
| 12/03/2015 | | | $12.50 | Inspection Fee | 02/01/2015 | $126,460.18 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $226.78 | $0.00 |

**EXHIBIT A**

4590-N-0232

**Mortgage Proof of Claim Attachment: Additional Page** (12/15)

Case number: _____ 1:16-bk-11729-MB _____

Debtor 1: _____ Tomer  Fridman _____

| Part 5: Loan Payment History from First Date of Default |
| --- |

| | | Account Activity | | | | | How Funds Were Applied / Amount Incurred | | | | | Balance After Amount Received or incurred | | | | |
| A. Date | B. Contractual payment amount | C. Funds received | D. Amount incurred | E. Description | F. Contractual due date | G. Prin, int & esc past due balance | H. Amount to principal | I. Amount to interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/31/2015 | | | $12.50 | Inspection Fee | 02/01/2015 | $126,460.18 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $239.28 | $0.00 |
| 01/01/2016 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $137,956.56 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $239.28 | $0.00 |
| 02/01/2016 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $149,452.94 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $239.28 | $0.00 |
| 02/10/2016 | | | $12.50 | Inspection Fee | 02/01/2015 | $149,452.94 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $251.78 | $0.00 |
| 02/24/2016 | | | $3.46 | Breach Letter Fee | 02/01/2015 | $149,452.94 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $255.24 | $0.00 |
| 03/01/2016 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $160,949.32 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $255.24 | $0.00 |
| 03/09/2016 | | | $12.50 | Inspection Fee | 02/01/2015 | $160,949.32 | | | | | | $1,915,591.12 | $0.00 | ($17,312.07) | $267.74 | $0.00 |
| 03/12/2016 | | | $10,163.40 | Escrow Disbursement: County Tax | 02/01/2015 | $160,949.32 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $267.74 | $0.00 |
| 04/01/2016 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $172,445.70 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $267.74 | $0.00 |
| 04/07/2016 | | | $12.50 | Inspection Fee | 02/01/2015 | $172,445.70 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $280.24 | $0.00 |
| 04/14/2016 | | | $17.13 | Breach Letter Fee | 02/01/2015 | $172,445.70 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $297.37 | $0.00 |
| 05/01/2016 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $183,942.08 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $297.37 | $0.00 |
| 05/09/2016 | | | $12.50 | Inspection Fee | 02/01/2015 | $183,942.08 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $309.87 | $0.00 |
| 05/10/2016 | | | $16.59 | Breach Letter Fee | 02/01/2015 | $183,942.08 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $326.46 | $0.00 |
| 06/01/2016 | $11,496.38 | | | Regular Payment Due | 02/01/2015 | $195,438.46 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $326.46 | $0.00 |
| 06/02/2016 | | | $60.00 | Corporate Advance | 02/01/2015 | $195,438.46 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $386.46 | $0.00 |
| 06/09/2016 | | | | Petition Date | 02/01/2015 | $195,438.46 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $386.46 | $0.00 |
| 06/09/2016 | | | ($242.93) | Corporate Advance Adjustment | 02/01/2015 | $195,438.46 | | | | | | $1,915,591.12 | $0.00 | ($27,475.47) | $143.53 | $0.00 |

**EXHIBIT A**

4590-N-0232

## CERTIFICATE OF SERVICE OF PROOF OF CLAIM

I hereby certify that a true and correct copy of the foregoing document has been served upon the following parties in interest on or before October 11th, 2016  via electronic notice unless otherwise stated:

**Debtor**          *Via U.S. Mail*
Tomer  Fridman
25420 Prado De Las Peras
Calabasas, CA 91302

**Debtors' Attorney**
Tomer Fridman
Debtor Pro Se
25420 Prado De Las Peras
Calabasas, California  91302

**Chapter 13 Trustee**
Elizabeth F. Rojas
15260 Ventura Blvd., Suite 710
Sherman Oaks, CA 91403

Respectfully Submitted,

/s/ Andrew Kussmaul
Andrew Kussmaul

**EXHIBIT A**


Prepared by: DAVID HENSON

# MONTHLY ADJUSTABLE RATE PAYOPTION NOTE
## (MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

**THIS NOTE CONTAINS A PREPAYMENT PENALTY.**

| JULY 02, 2007 | ENCINO | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

3915 PRADO DEL MAIZ, CALABASAS, CA 91302-3633
[Property Address]

1. **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 1,470,000.00 ("Principal"), plus interest, to the order of Lender. The Principal may increase as provided under the terms of this Note but will never exceed 115 percent of the Principal amount I originally borrowed. This is called the "Maximum Principal Limit." Lender is Countrywide Bank, FSB.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or its successors or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2. **INTEREST**

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount has been paid. I will initially pay interest at a yearly rate of 8.625 %. This is my initial interest rate and is the rate for determining the interest I owe until it changes as provided below. Interest will be charged on the basis of a twelve-month year and a thirty-day month.

The interest rate used to calculate the initial Minimum Payment described in Section 3 is 1.000 %. When I make a Minimum Payment which is based on an interest rate that is less than the rate of interest due, the unpaid interest is added to the Principal amount. This is known as "deferred interest" or "negative amortization."

**(B) Interest Rate Change Dates**

The interest rate I owe may change on the first day of the first scheduled monthly payment, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**

On each Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available

CERTIFIED TO BE A TRUE AND EXACT
COPY OF THE ORIGINAL

PayOption MTA Non-Intro Period Note

Page 1 of 5

BY:

**EXHIBIT A**

LOAN #:

twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 60/100                         percentage point(s)   3.600 (this amount is the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than   9.950 % or lower than the Margin. The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**

**(A)   Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the   first              day of each month beginning on SEPTEMBER 01, 2007  . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  AUGUST 01, 2037           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)   Amount of My Initial Minimum Payment**

The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment. Each of my initial Minimum Payments until the first Payment Change Date will be in the amount of U.S. $ 4,728.10              , unless adjusted under Section 3(F). If the Minimum Payment is not sufficient to cover the amount of the interest due, negative amortization will occur.

**(C)   Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the   first              day of  SEPTEMBER, 2008  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The Minimum Payment is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)   Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) applies, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than   7.500%  of my prior monthly payment. This limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by multiplying the amount of my Minimum Payment due the month preceding the Payment Change Date by the number   1.075 . The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

CERTIFIED TO BE A TRUE AND EXACT
COPY OF THE ORIGINAL

BY:

COMMONWEALTH LAND TITLE CO.

• PayOption MTA No Intro Period Note

Page 2 of 5

**EXHIBIT A**

LOAN #:

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the Payment Cap described in Section 3(D), my Minimum Payment could be insufficient to pay the interest portion of the monthly payment that would repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest due and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest due, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Principal Limit equal to ONE HUNDRED FIFTEEN                    percent ( 115 %) of the Principal amount I originally borrowed. On the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the then-current interest rate.

**(G) Required Full Payment**

On the tenth                    Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional monthly payment options ("Payment Options") that are greater than the Minimum Payment. The Payment Options are calculated using the new interest rate in accordance with Section 2(D). The following Payment Options may be provided:

(i)  Interest Only Payment: the amount that would pay only the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  Amortized Payment: the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments based on the then-current interest rate.

(iii)  15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments at the then-current interest rate.

These Payment Options are only available if they are greater than the Minimum Payment. Because the interest rate may change monthly, the amounts of each of these Payment Options may also change monthly.

**4.  NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction that could result from my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be

*CERTIFIED TO BE A TRUE AND EXACT COPY OF THE ORIGINAL*

*COMMONWEALTH LAND TITLE CO.*

Pay Option MTA No Intro Period Note

Page 3 of 5

**EXHIBIT A**



LOAN #: ▮▮▮▮▮▮▮

reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of the Minimum Payment. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each Minimum Payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the Minimum Payment by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of any different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. DOCUMENT CORRECTION

In the event that Note Holder at any time discovers that this Note, Security Instrument, Addenda, Rider or any other document related to this loan is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan, or otherwise contains an error, such as a clerical mistake, calculation error, computer error, printing error, electronic transmission error, or similar error, I agree, upon notice from Note Holder, to re-execute any documents that are necessary to replace or correct any such documents and return them within ten (10) days of receipt. I also agree that I will not hold Lender responsible for any damages which result from any such error.

CERTIFIED TO BE A TRUE AND EXACT
COPY OF THE ORIGINAL

COMMONWEALTH LAND TITLE CO.

▮ PayOption MTA No Intro Period Note

Page 4 of 5

**EXHIBIT A**



LOAN #: [REDACTED]

**12. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender. To the extent permitted by Applicable Law, Lender may charge reasonable fees as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

I agree to the Prepayment Penalty Addendum attached hereto and made a part hereof.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____   _____
TOMER FRIDMAN                                                                        -Borrower

_____
                                                                                             -Borrower

_____
                                                                                             -Borrower

_____
                                                                                             -Borrower

PAY TO THE ORDER OF                          PAY TO THE ORDER OF
COUNTRYWIDE HOME LOANS, INC                  COUNTRYWIDE BANK, FSB
WITHOUT RECOURSE                             WITHOUT RECOURSE
COUNTRYWIDE BANK, FSB                        COUNTRYWIDE HOME LOANS, INC

BY  _Laurie Meder_                           BY  _Michele Sjolander_                    PAY TO THE ORDER OF
    LAURIE MEDER                                 MICHELE SJOLANDER                      WITHOUT RECOURSE
    SENIOR VICE PRESIDENT                        EXECUTIVE VICE PRESIDENT               COUNTRYWIDE BANK, FSB

                                                                                       BY  _Laurie Meder_
                                                                                           LAURIE MEDER
                                                                                           SENIOR VICE PRESIDENT

• PayOption MTA No Intro Period Note          Page 5 of 5

**EXHIBIT A**

RECORDED AT THE REQUEST OF
CHICAGO TITLE COMPANY

Recording Requested By:
K. SANTOS

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
DAVID HENSON

——————————— [Space Above This Line For Recording Data] ———————————

[Escrow/Closing #]

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JULY 02, 2007 , together with all Riders to this document.

(B) "Borrower" is
TOMER FRIDMAN, A SINGLE MAN

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Page 1 of 16

 -6A(CA) (0207)   CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291        Form 3005  1/01
CONV/VA



**EXHIBIT A**

Borrower's address is
3915 PRADO DEL MAIZ, CALABASAS, CA 91302-3633
Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is
Countrywide Bank, FSB.
Lender is a FED SVGS BANK
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
**(D) "Trustee"** is
ReconTrust Company, N.A
225 West Hillcrest Dr., MSN TO-02, Thousand Oaks91360
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this
Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated JULY 02, 2007        . The
Note states that Borrower owes Lender
ONE MILLION FOUR HUNDRED SEVENTY THOUSAND and 00/100

Dollars (U.S. $ 1,470,000.00   ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  AUGUST 01, 2037    .
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association
or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage
to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

**EXHIBIT A**

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                     of                  LOS ANGELES                  :
[Type of Recording Jurisdiction]                        [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of
3915 PRADO DEL MAIZ, CALABASAS
[Street/City]

California 91302-3633 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

VMP -6A(CA) (0207)          CHL (08/05)          Page 3 of 16                    Form 3005  1/01

**EXHIBIT A**

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**EXHIBIT A**

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

-6A(CA) (0207)          CHL (08/05)          Page 5 of 16          Form 3005 1/01

**EXHIBIT A**

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

**EXHIBIT A**

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

**EXHIBIT A**

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

-6A(CA) (0207)          CHL (08/05)          Page 8 of 16          Form 3005 1/01

**EXHIBIT A**

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

 -6A(CA) (0207)        CHL (08/05)        Page 9 of 16        Form 3005 1/01

**EXHIBIT A**

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

**EXHIBIT A**

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

-6A(CA) (0207)          CHL (08/05)             Page 11 of 16                    Form 3005 1/01

**EXHIBIT A**

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

-6A(CA) (0207)        CHL (08/05)            Page 12 of 16                    Form 3005 1/01

**EXHIBIT A**

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

VMP®-6A(CA) (0207)      CHL (08/05)          Page 13 of 16                    Form 3005 1/01

**EXHIBIT A**

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0207)      CHL (08/05)          Page 14 of 16                    Form 3005  1/01

**EXHIBIT A**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
TOMER FRIDMAN                                    -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

**EXHIBIT A**

State of California
County of *Los Angeles*                                        } ss.

On _____*7/3/07*_____ before me, *CORINA ESPERANZA CASTILLO*,
_____*Notary Public*_____ personally appeared

*TOMER FRIDMAN*
_____

_____

_____, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

CORINA ESPERANZA CASTILLO
Commission # 1468592
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2008

-6A(CA) (0207)        CHL (08/05)        Page 16 of 16        Form 3005  1/01

**EXHIBIT A**



**ESCROW ACCOUNT
DISCLOSURE STATEMENT**

P.O.Box 220720
Chicago, IL 60622

| | |
|---|---|
| Analysis Date: | 8/5/2016 |

TOMER FRIDMAN
3915 PRADO DEL MAIZ
CALABASAS CA 91302

Customer Service
Monday-Friday    9:00 a.m. to 5:00 p.m. CT
Saturday    10:00 a.m. to 2:00 p.m. CT

| | Present Payment | NEW PAYMENT Effective 07/01/2016 |
|---|---|---|
| Principal & Interest | $11,496.38 | $11,496.38 |
| Escrow Deposit | $1,949.28 | $1,791.99 |
| Optional Insurance | $0.00 | $0.00 |
| Other | $0.00 | $0.00 |
| Subsidy | $0.00 | $0.00 |
| Total | $13,445.66 | $13,288.37 |

**ESCROW ANALYSIS STATEMENT**

At least once every12 months Fay Servicing analyzes your escrow account, in accordance with federal regulations, to ensure we collect sufficient funds to pay escrow items when they are due. The escrow account analysis below is an estimate of the activity that will occur in your escrow account over the next 12 months. The analysis will show if you currently have a shortage or overage in your account. If there is an overage amount over $50, the full amount of the overage will be refunded to you.

| Escrow Advance | | | | | | |
|---|---|---|---|---|---|---|
| BK Filed | As of Filing Date | **PROJECTED ESCROW ACTIVITY FOR THE NEXT 12 MONTHS** | | | | |
| 6/9/2016 | $27,475.47 | MONTH | PAYMENTS TO ESCROW | PAYMENTS FROM ESCROW | DESCRIPTION | PROJECTED BALANCE | REQUIRED BALANCE |
| Escrow in POC: | | | | | | | $8,959.93 |
| | $0.00 | Jul-16 | $1,791.99 | $0.00 | | $1,791.99 | $10,751.92 |
| | $0.00 | Aug-16 | $1,791.99 | $0.00 | | $3,583.97 | $12,543.90 |
| | $0.00 | Sep-16 | $1,791.99 | $0.00 | | $5,375.96 | $14,335.89 |
| | $0.00 | Oct-16 | $1,791.99 | $1,177.00 | Homeowners Ins | $5,990.94 | $14,950.87 |
| | $0.00 | Nov-16 | $1,791.99 | $10,163.42 | County Tax | ($2,380.50) | $6,579.44 |
| | $0.00 | Dec-16 | $1,791.99 | $0.00 | | ($588.51) | $8,371.42 |
| | $0.00 | Jan-17 | $1,791.99 | $0.00 | | $1,203.48 | $10,163.41 |
| | $0.00 | Feb-17 | $1,791.99 | $0.00 | | $2,995.46 | $11,955.39 |
| | $0.00 | Mar-17 | $1,791.99 | $10,163.40 | County Tax | ($5,375.96) | $3,583.98 |
| | $0.00 | Apr-17 | $1,791.99 | $0.00 | | ($3,583.97) | $5,375.96 |
| | $0.00 | May-17 | $1,791.99 | $0.00 | | ($1,791.99) | $7,167.95 |
| | $0.00 | Jun-17 | $1,791.99 | $0.00 | | ($0.00) | $8,959.93 |
| | $0.00 | | | | | | |
| | $0.00 | Total: | $21,503.82 (a) | $21,503.82 | | | |
| | $0.00 | | | | | | |
| | $0.00 | | | | | | |
| | $0.00 | | | | | | |
| | $0.00 | | | | | | |
| | $0.00 | | | | | | |

| Escrow in POC: | $0.00 | Required | $8,959.93 | |
|---|---|---|---|---|
| Escrow at Filing: | $27,475.47 | Escrow Balance | ($27,475.47) | |
| Total: | ($27,475.47) | Total Required: | $36,435.40 | Escrow Shortage Placed in POC |

**EXHIBIT A**

UNDERSTANDING YOUR MONTHLY
ESCROW PAYMENT AMOUNT

**1. Projected Monthly Escrow Payment**
The section titled "Projected Escrow Activity for the Next 12 Months" is a schedule that represents all anticipated payments to and from escrow for the coming year. First, we take the total of all Projected Payments from Escrow (a) and divide it equally over 12 months to determine your Projected Monthly Escrow Payment: $21,503.82/ 12 months = $1,791.99

**2. Escrow Surplus/Shortage**
The minimum escrow balance required in your account is known as the Required Low Point. This is $3,583.98 under "Projected Escrow Activity for the Next 12 Months". The Required Low Point is set in accordance with your mortgage contract, state law or federal law.   Mortgage Insurance, if any, is not included in the Required Low Point calculation. Next, we compare the Projected Low Point $5,375.96 to the Required Low Point $3,583.98  to determine the Required Balance $8,959.93. Next, we compare the Required Balance $8,959.93 to the Escrow Balance $27,475.47  to determine the overage/surplus: You have a shortage of $36,435.40 because the Escrow Balance of $27,475.47  is less than the Required Balance of $8,959.93. The shortage is placed in the proof of claim.

**3. New Monthly Escrow Payment**
Monthly Escrow Payment:    $1,791.99
Effective Date                     07/01/2016

<hr>

**ESCROW ACCOUNT DISCLOSURE STATEMENT**

**ACCOUNT HISTORY**                                    **Date:** 08/05/2016

██████████████

This is a statement of actual activity in your escrow account from 00/00/0000 through 00/00/0000. This section provides last year's projections and compares it with actual activity.

An asterisk (*) indicates a difference from a previous estimate either in the date or amount and may be caused by any of the following:

· The actual amount of insurance or taxes paid since your last Escrow Analysis Statement was higher or lower than anticipated

· Additional funds were applied to your escrow account

· The time elapsed between payments to escrow and disbursement from escrow was shorter or longer than anticipated on your last Escrow Analysis Statement.

| Month | Payments Projected | Actual | Disbursements Projected | Actual | Description | Escrow Balance Projected | Actual |
|-------|--------|--------|--------|--------|-------------|--------|--------|
|       |        |        |        |        | Beginning Balance |    |        |
| TOTAL | $0.00  | $0.00  | $0.00  | $0.00  |             | $0.00  | $0.00  |

**EXHIBIT A**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

4375 Jutland Drive/Suite 200/P.O. BOX 17933/San Diego, CA 92177

A true and correct copy of the foregoing document entitled (*specify*): Opposition to Debtor's Hearing/Motion to Value
Real Property

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
04/07/2017        , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

  United States Trustee, ustpregion16.wh.ecf@usdoj.gov
  United States Trustee (represented by): S Margaux Ross, margaux.ross@usdoj.gov
  Attorney for Debtor: William H Brownstein, brownsteinlaw.bill@gmail.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)    04/07/2017       , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| Honorable Judge Martin R. Barash | ATTORNEY FOR DEBTOR | DEBTOR |
| Suite 342, Courtroom 303 | William Brownstein | Tomer Fridman |
| 21041 Burbank Boulevard | 11755 Wilshire Blvd., Suite 1250 | 25420 Prado De Las Peras |
| Woodland Hills, CA 91367 | Los Angeles, CA 90025 | Calabasas, CA 91302 |

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 04/07/2017 | Esteban Garcia | /s/ Esteban Garcia |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**